Mr. Chief Justice, and may it please the Court, the Court held in Delaware v. Prowse that in the absence of reasonable suspicion, it is an unreasonable seizure under the Fourth Amendment for police to stop a car for the purpose of checking the motorist's driving credentials. In Brown v. Texas, the Court similarly held that in the absence of reasonable suspicion, may not stop a person without reasonable suspicion for the purpose of requiring the individual to identify him or herself. These cases are grounded in the principle that in this country, we enjoy the right to go about our business free from government interference unless or until the police have just cause to detain us. Petitioner's motion to suppress alleged that the police acted exactly as they did in Prowse and Brown, they stopped the car without justification, elicited his name, and gained access to his DMV records, which otherwise would not have been discovered. Instead of suppressing the poisonous fruit of the illegal car stop, the DMV records, the New York Court of Appeals chose to create a new categorical rule that prevents application of the exclusionary rule whenever the police act in violation of Prowse. Scalia. Was the poisonous fruit the DMV records, or was the poisonous fruit the fact that this person who is contained in the records was the one driving the car? Why wasn't that the fruit? I mean, the records were there anyway. What new information came from the stop was the fact that that is the person who was driving the car. Why wasn't that what should have been suppressed? Well, Justice Scalia, that is also a fruit of the poisonous tree. And I'd agree with you on that fruit. Did you ask for that to be suppressed? Yes, that was asked for in the motion at the trial level. But that's not what's before us here, right? That's right. And that's because the court below decided that the case only addressed the DMV record and indicated that the DMV records were not properly suppressible fruit, and that's the issue. Suppose that you had won at the trial level. The judge suppresses everything and dismisses the indictment, and Mr. Tolentino walks out of the courtroom and is observed by the officer who conducted the stop in this case. The officer sees him getting into a car and driving away, even though his license is still suspended. Now, could he be arrested for that? Yes, Justice Alito, he could. Even though the officer would have no reason to know that this particular person has a suspended license, were it not for the chain of events that followed from the initial allegedly illegal stop. Well, although that initial stop provided the tainted information that he didn't have a license, the subsequent reoffense would certainly taint the illegality of the first stop and make the second offense. All right. Let me ask you a related question. Suppose that after you filed your suppression motion, the State of New York became nervous about this issue, and they checked all the surveillance cameras in the vicinity of the stop, and lo and behold, they found a tape showing Mr. Tolentino driving the car shortly before the stop here. Could he be prosecuted for illegal drive, for driving without a license, with a suspended license, using that evidence? Well, I believe that under those circumstances, it would be entirely proper to prosecute the case. With that, that would be evidence that came from an independent source. Well, I mean, in light of those two answers, it does seem to me that your real problem here is not with the DMV records. It's with the police officer's observation after the stop that Mr. Tolentino was driving a car. Well, Justice Alito, again, all of the — there's lots of evidence that could be properly the fruit of the poisonous tree. There was a statement made here that the Petitioner said that he did not have a New York State license. There's the observations of the officer, and there's the DMV records. They're all properly considered fruit, and in this case, the DMV records are of important evidentiary significance. Is there any — is there any case in this Court where what was suppressed was information that was lawfully in the government's possession as opposed to evidence that was acquired originally through the search? I mean, here we have the DMV records, they're public records. I don't know of any decision of this Court that deals with suppression of evidence that is already in the government's possession. And if I'm wrong about that, you tell me. Yes, Justice Ginsburg, I don't believe there has been precedent on that issue. However, in the independent source doctrine cases, they're — they've always required the possession or the — they have knowledge of the information in order for it to defeat the exclusionary rule application. So in this case, although the government had the DMV records — well, first of all, the law enforcement didn't have the DMV records. It was only until the illegality and the exploitation of that illegality that they acquired the records from the Department of Motor Vehicles. So in that sense, it was clearly at fruit of the poisonous tree. But even if you look at government as an integrated whole, the prior possession of the records was meaningless, of no value to them, until the illegality, when it acquired its meaning. Suppose the police, following Mr. Tolentino, had noted down his license plate and then got this information, not as a result of his driver's license, but of the plate on the car. Well, Justice Ginsburg, the — the plates of the car would not indicate the driver's license of the driver. And in this case, Mr. Tolentino — But they might show him as the owner of the car. The owner of the car. And I believe in Respondent's brief, they indicated that some of the police computers will even show descriptive features or maybe even a picture of the driver. But in this case, Mr. Tolentino was not the registered owner of the vehicle. So that wouldn't have provided them with cause to pull the car over. This goes back to a question Justice Alito asked in a probably more artful way. But I'm not quite sure what's supposed to happen, under your view, after this stop. They stop the person. They get the information that he's driving under a suspended license. And they're supposed to say, oh, you know, we shouldn't have stopped you. I'm sorry. Have a nice day. Go ahead. And then he leaves? Is that what goes on? No, Justice Kennedy. That's not what would happen. The State would impound the car. They would not allow a person with a proper license to get back in the car and drive on. That would — and in order for the Petitioner to get the vehicle back, he would — if it was his vehicle. Why isn't impounding the car the fruit of the illegal search? Because the impoundment statutes are based on a public safety interest. And so it doesn't — But why doesn't the public safety interest then permit us to use this evidence in order to protect the public safety further by punishing him for not driving? I don't see the difference. Because in order to do that, it would be tantamount to sanctioning a fishing expedition in this case, Justice Kennedy, because it would be allowing the police without possible suspicion. Why would you say the same thing about impounding the car? Because the interests are different and because it's not a forever removal of the Petitioner's right to get the car, whoever the rightful owner is. It's just making sure that the Petitioner can't get back in the car and continue driving. In order to get the vehicle back, at least in New York State, the — if it was the Petitioner's, they'd have to show proof that they had a valid license. And if it wasn't his vehicle, then the other — the true owner would have to get — provide proper credentials to establish that they could take the vehicle into their possession, and also they would have to have proof that the Petitioner himself had cleared up his record or get some sort of a release from the court or from the district attorney's office. So the whole purpose of that impoundment statute is for public safety. Breyer, I don't understand the answer you gave to Justice Alito. Maybe I mixed it up. The police stopped the car without cause, illegal stop. And you say, as a result of the stop, they found out all these things in the records that he had no license, right? Yes. So that shouldn't be introduced into his trial for driving without a license. Yes. All right. Now, the question I'd heard put was, suppose after they got this information, and they don't arrest him then, but he gets into the car again and starts driving. You said then they could arrest him. Well. Is that right? Why? Why isn't that just as much the fruit of the poisonous tree? They found out he doesn't have a license by the record which came to them from an illegal stop. I just don't understand it. Did I get you right as to what you said? What I meant to say is that attenuation doctrine would apply. Now, if the person was got back in his car immediately at that scene and started off driving, then I'm not sure that the attenuation doctrine would be there. So therefore, they couldn't arrest him. So what they do is they – is that right? Well, yes, but it's the same thing. They see he – they stop him. They get the records wrongly. They see he has no license. He says, how did you know? I said, we just looked at your license. That was illegal. Goodbye, gets into the car and drives off, and they can do nothing. Except I just have to remind you that they could impound the car. How could they? They can impound the car. Because? Because of the statutory right. Because they now know that he has no license to drive. So either the car will – if there's another person who can't properly take possession of the vehicle, then that person can drive off with the car. But the Petitioner himself, who doesn't have a valid license, he can't get back in the car. And if the police arrest the guy, find out who he is, don't stop the guy, find out who he is, don't arrest him, but then now they know that this is the kind of guy who drives without a license. And so they go to his house the next day, and they see him getting back in the car. Could they arrest him then? Justice Kagan, I think the answer would be yes. And the reason why is because if they see him on a subsequent occasion, and that they're seeing him re-offend, and that would attenuate the taint of the first. So the re-offense just cuts off the original taint? I believe so, yes. I mean, it would be attenuation analysis, but to me it would be pretty clear-cut that that's how it would resolve. Roberts. Roberts. So the only way that the police can prevent an unlicensed driver from driving in this situation is to take away his car? You know, impound the car, as you say. Well, unless they want, for any offense, you know, it's just expired driver's license, expired last week. They can't just give the guy, they can't give the guy a ticket, right? All they can do is take away his car? Your answer to a number of the questions has been that have tried to address the issue of what are they supposed to do, since they know they have somebody who's violating the law, is that, well, they can take away the car. And I just want to know if that's the only permissible response by the police when they know that the person driving has violated the law. If the stop was- Totally illegal. Totally illegal. Yep. Then I don't think that they --if there were --I don't think that they could prosecute that case. They couldn't charge him with the- And the only way to prevent him from reoffending immediately is to impound the car? Because if he gets into the car and drives, then or can the police arrest him right away? Again, that would be attenuation analysis, but I think that the taint of the initial illegality would make that a much more difficult case. But in that situation, the police also could, again, if there was another person who had authority to take possession of the vehicle, that person could take the vehicle, the registered owner or someone with authority to do that. But the police would not be powerless to see the defendant get back in the car. I mean, that would be on the- Why not? Why wouldn't they- Because of the impoundment statutes. Is that your answer, then? They've got to impound the car every time or let the guy just go? Well, they could drive the person home to his house or take him to the corner or tell him not to drive until he cleared up his license. They could do that, but- They could tell him not to drive until he clears up his license. Yes, I mean, that would be another alternative. But this scenario that you are talking about would be highly unlikely, and it would be almost in bad faith if the police stopped him illegally, found out that he had the suspended license, and then let him get back in right away. That wouldn't be the way that the police would normally return that, unless there was a way to properly maintain the safety of the folks. Well, how much time do they have to wait? Justice Kagan brought up the police go to his home the next day. You brought up attenuation theory a number of times. I think now you have answered. He gets back into the car, drives it away. They can do nothing, because it's too close to when they discovered his record of his suspended license. How much of an interval must there be? What do you mean by attenuation doctrine? Well, attenuation would be evaluated on a case-by-case basis, Justice Ginsburg. But I would think if even an hour later, if the Petitioner brazenly drove by those same officers, you know, thumbing his nose at them high, that would be attenuation analysis would apply at that point. You could say that if he got back in the car right after the stop, if the police for some reason did not impound the car and he got back in the car, that's another offense. And so by your theory, then they could properly arrest him and use all of this knowledge in a prosecution. And a court very well may agree with you on that. My only qualm with that is that when the officers illegally find out that he has a suspended license and then to let him get back in and immediately arrest him, it's sort of in bad faith. But what does that word, the bad faith? I take it your rule is identical if, when they wrongly stop the car, they look up the records, the records say he has no license. And in addition, he's wanted on 17 drug warrants and for three triple-axe murders. Again, you can't do anything about it. No. No, Justice Breyer. Can you? You cannot do anything about it or you can? You can. What? How? Well, the warrants are entirely different. Why? Because of the Kerr-Frisbee doctrine, the warrants for other cases are a method by which the court brings the body of the defendant to court. So if, in fact, a policeman stops a person without cause and learns as a result of that that there are many warrants outstanding against him, he then can arrest the person and can he introduce those warrants into court as evidence or whatever if it's relevant? Absolutely. He can bring them in. The warrants are not evidentiary. I suppose the way that the policeman stops the person and gets the information illegally is he takes an axe and breaks into the house, the policeman, and thereby. So what I'm showing, I just think this case has lots of implications and I'm looking for a rule here that's going to work in a lot of different situations. Well, there's actually, I'm sorry, Justice Breyer, I'm not sure I followed. You want to say that if, in fact, he learns that this man from the public records is a triple-axe murderer. Right. He can do nothing about it, I said, and you said no, he can do something about it. I just wanted to know the distinction. Okay. So there's different, again, just to be clear, the warrant, the arrest warrant is not of evidentiary value according to the Davis. Is that something that would be introduced in court? It's just a method for bringing the defendant into court. And so in that case, they would properly be allowed to arrest him. It happens to be a description of the individual, not a warrant he gets from the public record, which is read off to him when he called in. A description, a red tie, can he use that and introduce it into evidence? I mean, is this case about, what's it about, driving, or does it have broader implications? I thought that the Court had held that any public record at all is immune, is that right? Immune from the normal fruit-of-poisonous-tree rule. The New York Court of Appeals rule categorically removed this. Yes, and I was testing that. I wanted to know, is that, in your opinion, a correct rule in all cases? No. And in fact, the one of the briefs. I mean, an incorrect rule, the opposite rule. No rule. Well, the problem with that rule, the categorical rule, is that it will create a fresh incentive for police officers to make these kind of suspicionless stops, and so it will encourage police to violate the Fourth Amendment and not only explore. Not if you allow the suppression of the policeman's identification of the individual driving the car. I mean, nobody is contending that that can't be suppressed. So if you can't bring in the policeman to say, yes, this fellow Smith, whose record we have here, was the fellow driving the car, once that's out, what incentive is there to make these suspicionless stops? What I'm saying is you're getting at it from the wrong end. What should have been suppressed was the policeman's identification of the person who was driving the car. Yes. And if this case, if this case we prevail, and this case was returned to trial court, that both of those issues would be at play and would be litigated. The observations of the defendant and the DMV records are both suppressible fruit, and both of them would be subject to suppression. Alito, but that's not the argument you seem to be making. You want to suppress the knowledge that the police derived from the stop that Mr. Tolentino's license is suspended, and you would allow an exception to that only if there was attenuation. But why isn't the simpler solution to a case like this that you can't suppress the knowledge of matters that are in a government record? However, you can suppress observations by the police on the scene that flow directly from the illegal stop. Well, again, the — our position is that both of those items are properly suppressible, and it is true in this circumstance that the observations would probably subsume the need for the DMV records. However, the observations may not be sufficient in certain circumstances, and in those cases it would be more important — it would be very important to have both of the items suppressible, and there's no reason. There's not the rule about not being able to suppress a person's identity. You've been asked a couple of times why you're going after the DMV record. You should go after the police identification of Joe Smith or whoever. I thought there was some rule that says the identity of the person is not suppressible. Am I wrong about that? That is a restatement of the Kerr-Frisbee doctrine, that essentially says that a person cannot suppress himself, his body, in order to defeat the jurisdiction of the court. Kennedy. And so how does that fit with your earlier answers that his identity here could be suppressed? And then I'll ask the second question. If you say that you can suppress his identity from information they gained after the stop, when they saw him, why couldn't they say, well, we saw this man before we stopped him? There's a distinction between the identity and the elicitation of his name. And the elicitation of his name, which led to the DMV records, would give us a more specific answer. It gets you nowhere to say John Smith. You have to say John Smith was driving the car. It's the driving of the car. That you want suppressed. That's not the identity. I mean, John Smith, fine, you can say John Smith, John Smith, John Smith, all you like at court. It's not going to get a conviction. But when you say John Smith was driving the car, then you are eliciting testimony from the officer concerning information he would not have had but for the stop, that John Smith was driving the car. Right? So this Court has always defined evidentiary fruit as something that the — of evidentiary value, which the public authorities have caused an arrested person to yield to them during an illegal detention, and that's from the Davis case. And the DMV records would fit that definition of evidentiary fruit. And in this case, because it is the classic situation where there's a sufficient causal connection between the Fourth Amendment violation and the subsequent discovery of the evidence to justify suppression, there's no reason not to apply the exclusionary rule here. And in fact, it meets all the definition of the sort of case where there would be very high level of deterrence as a result of applying the exclusionary rule. I see that I have 5 minutes. I'd like to reserve the rest of my time. Roberts. Thank you, Ms. Schwartz. Mr. Chief Justice, and may it please the Court. I would like to start with your question, Justice Breyer, about what the ruling below was and what's at stake in this case. What the court of appeals held was quite narrow. It said, and I'm reading from page 105A of the appendix, We merely hold that a defendant may not invoke the fruit of the poisonous tree doctrine when the only link between improper police activity and the disputed evidence is that the police learn the defendant's name. So the court of appeals is focusing on the fact that all that was elicited here is the name of the defendant, and that's appropriate. Asking a name is fundamental to any encounter between police and citizens, and that's because the officer Sotomayor, you're suggesting that it's okay for the police to walk up to any citizen anywhere and say, you're under arrest until you give me your name? Absolutely not, Your Honor. Well, there's been no doubt here that it was a stop without suspicion. That's been presumed. So how is that different from what I just asked you? Because That they took a person randomly, detained them without any suspicion, and said, give me your name. Are you suggesting that that's okay? No, I'm not. The legality of the stop here has not been adjudicated. We are presuming it's a stop at utility. I'm presuming. I know that there's counterarguments to that. We are not at all challenging this Court's decisions, certainly not Delaware v. Prouse or any others which hold that the police may not stop someone without basis, and may not certainly enforce the sort of statute that was at issue in Hybel without some basis for asking for identification. So isn't the eliciting of the name as a result of an unlawful stop something that could be suppressed? It should not be subject to suppression, and that's a distinct question from whether or not there was a constitutional violation that occurred in the stop and the action of the name. Name is different than the person, the body of the person, which has to do with the Court's jurisdiction. But why isn't the name any different than a wallet that's in somebody's pocket or a shirt or a hat, whatever is on the person? Why is a name not subject to suppression? Let's go past what happens here, because I understand the disconnect between the name, the DMV record, and seeing the person driving. How we tie those together are a different issue. But you made a bold statement when you started. You said that the police securing a name is never suppressible. Because it has a unique status, as this Court recognized in Hybel in the criminal justice system. Asking for a name is a routine and accepted part of any stop because the officer needs to know who he's dealing with. He faces an inordinate risk, as this Court noted in Mims and most recently in Arizona v. Gantt, of being shot when he approaches a person. And the difference between stopping a car and stopping a person on the street, as Justice Sotomayor asked, you can't stop somebody on the street for no reason and the person looks to you suspicious. So you stop the person and say, tell me your name. For a Terry stop, you have to have reasonable suspicion. So why isn't it the same for somebody who's driving a car? I think it is the same in terms of what the Fourth Amendment requires, and Delaware v. Prowse holds that. We're not taking issue with that or asking this Court to retreat from that. What we are saying is that where all that is elicited is the name, it's not appropriate to apply the exclusionary rule, which is a very distinct question. Sotomayor, you're suggesting that there should be an exception for knowledge of identity. Suppose there were a clearly illegal search, and the government is looking for a head of some kind of criminal syndicate and knows this only by an alias, all right, and finds out as a result of this illegal search, pick your alias, you know, John Smith. Finds out, no, finds out that this person whose house they're searching is John Smith, is the head of this criminal syndicate. Can the government then use that knowledge of identity, knowledge that this person goes under this alias in order to build a case around this guy? And your hypothetical, I'm not sure whether there would be any Fifth Amendment issues that would be at play, but it's not. Kagan No, they find out this person's alias as the result of the illegal search, and that allows them to build a substantial criminal case. If all that is obtained is the name, then the exclusionary rule should not be applied. So there's a diary and it says, I am John Smith. That's Kaiser-Sose. I am Kaiser-Sose. That would not be suppressible. The diary itself, the document, would be suppressible. The knowledge that that person is Kaiser-Sose would not be subject to suppression. And knowledge should never be something that is subject to suppression in any event. Suppose that when the police stopped this particular car, they saw that Mr. Tolentino was smoking marijuana or snorting cocaine or drinking from a bottle of alcohol or he had somebody tied up, bound and gagged on the back seat of the car. Now, all of those things would clearly be the fruit of the all of those observations would clearly be the fruit of the allegedly illegal stop, right? That's correct, Your Honor. And even though they were in plain view, they would all be suppressed, right? That's correct, Your Honor. But you're saying that the observation that Mr. Tolentino is at the wheel of the car, that is not suppressed. I would like to distinguish between the observation of the person driving the car to the extent that you might have a case in which that observation is made after the stop as opposed to before the stop. That's a different and distinct question. It's not presented in the case that's before the Court right now. From the question of whether the exclusionary rule should be applied when only the name is elicited, the observations, it may be, as Justice Ginsburg suggested, that under Cruz, because the physiognomy of a person, five justices determine their the appearance, is not something that's subject to suppression, that the police officer's observation that it was in fact this individual who looks like this driving the car would not be subject to suppression either, but that's not presented. All that is at issue here is whether or not the elicitation of the name and the records directly linked to that are subject to suppression. Breyer. He made a mistake. He said in court, I was driving the car. He never should have said it. All right. Now, once he said it, now we know he's driving the car. Now you're saying why has this case even come up? Because once you have his name, the second he said it in court, you could go up looking at his records anyway and you'd find all these facts about them, which I guess you could bring in. Well, that's right, and that's part of why a name is not a special rule. So this case shouldn't be a special rule. It should just be a case of heart. What is it called? There's a doctrine. You would have found it anyway, inevitable discovery. You could resolve the case on the theory that, by definition, government records that are previously held. They're only inevitably discovered if he makes the mistake of saying what his name is. No, no, not that. The mistake of saying I was driving the car. And then, as Justice Scalia pointed out, maybe you could suppress that. So it would be, it would. In this case, the question of any observations of the defendant is waived. It was abandoned by operation of State law. You could have another case in which that was the issue. Once it's waived. Scalia, your friend said that it was raised below. What happened to it? What happened is this. In the suppression motion initially, the defendant sought to suppress a number of things, including the observations of the police. The trial court judge did not rule specifically on that aspect of the suppression motion. The trial court judge said that there would be a suppression hearing on the statement that the defendant made, but there would not be a suppression hearing with regard to the DMV records, because DMV records were not subject to suppression. At that point, the defendant pled guilty. And so by operation of State law, because, first of all, there was not a ruling specifically on the question of observations, and the defendant failed to bring that to the trial court judge's attention, and because the guilty plea was taken and you can only appeal when you plead guilty on a suppression motion where there's a final order, there's no final order on the observations, that's out of the case. That would be our position. You could have a subsequent case where that question would be presented if, in fact, an officer does not see a defendant until after he approaches the car. And in that case, you would have to determine whether or not Cruz and the five justices, which says the physiognomy of the defendant is not subject to suppression, controls and therefore allows the observations to come in. But it's not presented here. Roberts. Do you – is your position that they can do anything in terms of the search of the name? Could they punch it into Google or something like that and find out a lot more than just what they have in their own possession? I think that would be correct, Your Honor, but here you have records that not only are in the government's possession, and this Court never has suggested. No, no. I know it raises a different question, but, you know, you keep saying they're just suppressed or, you know, you're just talking about the name, but names are meaningless in the abstract. It's not just that the officer wants to know what to call him, it's what he wants to find out from the name. The officer. And these days, there's so many electronic databases, you can find out an awful lot just, you know, with the punch of a few buttons. You could, and I think that that's why if the Court was concerned about the potential breadth of that holding, it could narrow it to the use of the name to link to government records. In the field in particular, what an officer is going to look for is records that suggest danger. So, for example, what the officers have in New York State is they.  Well, but it's not limited to suggesting danger or whatever. It can, that may be what the officer on the scene is most interested in, of course. But once you get the guy's name, you're interested in a lot of things. That's right. And that's because you are in the process of conducting some sort of an investigation. And to suppress the knowledge of someone's identity would blink reality. Well, you're not suppressing the knowledge of someone's identity. All that's being suppressed is the evidence of criminal activity that you derive from that. I think it's very different than when you have drugs in the car, which would clearly be subject to suppression. All that you have here, first of all, that's elicited is the name. The name itself is not subject to suppression, nor did the defendant seek to have it suppressed, as the court of appeals observed. And so that should be the end of the inquiry. If the antecedent piece of evidence is not subject to suppression, then there's no poison that can flow from that to contaminate anything like the DMV records. Could I go back and do that? I think that's not right, Ms. Halligan, because the search is the poisonous tree. Now, it might be that the name can't be suppressed, but it still might be that everything that's discovered as a result of knowing the name, which would never be discovered unless the search had taken place, could be suppressible. Two points, Justice Kagan. I believe, first of all, that if the name is not suppressed and then something flows from the name, I don't think that you can skip that step and then suppress something that comes further down the road. But secondly, the fact that these records were already in the government's possession is precisely what takes this outside the scope of the Fruits Doctrine. The Fruits Doctrine has been held to apply repeatedly in cases where the evidence is in some sense the product of the illegal government activity. These records are simply not the product of any government activity. Why does it matter? I'm sorry. Alito, could I go back and ask you to explain what, how you think the request for suppression of police officers' observation was waived? That was raised in the motion to suppress, page 17a of the Joint Appendix. Now, the New York Supreme Court apparently didn't understand that that issue was in the case and ruled only on suppression of the records and tangible evidence. Is that right, 78a? What's the — what is Mr. Tolentino supposed to do at that point to preserve the issue of the suppression of the police officers' observation? To preserve the issue, Mr. Tolentino should have raised that fact to the judge, should have pointed it out pursuant to CPLR 71070, subsection 2. There's also case law explaining that when that happens, that is the obligation of the defendant, and the defendant cannot raise the issue on appeal if it's not brought to the attention of the trial court judge at that point. The defendant raises an issue before the trial judge. The trial judge ignores that issue, misses the issue. And then the defendant waives the issue unless the defendant says, by the way, you missed, you failed to address one of the arguments that I made? At the point at which the defendant pleads guilty, that is correct, Your Honor. The defendant pled guilty prior to seeking any ruling on that specifically or any clarification. None of this is briefed before the Court, but the defendant also did not raise the issue of the observations in the brief to the intermediate State appellate court, the State court of appeals, or this Court. So it has been deemed abandoned a long time ago, and in the oral argument before the New York court of appeals, the defendant seemed to concur in the fact that it had been abandoned. Roberts You make the point that these records are already in the government's possession. Yes. But, I mean, isn't that true of everything that's available on any type of database? Everything in Google or whatever the other search engines are is in the government's possession in the sense that they've got it. All they've got to do is identify it in their search, and they've got it. Well, this is in the government's possession in the literal sense of the word. And, in fact, to correct something that was said previously, although it's not in the record, the DMV records, along with other records such as arrest warrants, are, in fact, in the NYPD's possession. They use a database that the State police generate, which they download onto their servers. So they have it in their actual possession, which is different from the other. Roberts Well, it can't make a difference on whose server it is, does it? No, I'm simply saying that it is in their possession. Roberts It is information that they can get if they have the correct way of searching it, which is here by name. And the fact that they are drawn to the records because they have stopped this investigation and they have this name does not disqualify them from using those records. This Court has cited several times with approval to a case called Bynum in the D.C. Circuit, in which there were prints that were taken following an illegal detention, and those prints were suppressed. The prosecution knew that the defendant had committed the crime because those prints had been taken and matched, and the defendant or the prosecution was allowed to use a set of prints that it already had in its files on retrial. The same thing happened in both Davis and Hayes, in fact. In both of those cases, there were convictions on remand, and the prosecution's attention was drawn to the defendant only following some illegal activity. I'd like to ask you something about the practice in New York. I mean, there is an artificiality to this case because we are assuming that the stop was unlawful. Yes, Your Honor. But the police said it was lawful because the radio was blasting so loud. Why did this issue, even the issue of suppose it was unlawful, even come up instead of the city or the county saying what the police stopped him for was a traffic violation, was perfectly why get to the constitutional question when there's staring the prosecutor, the court in the face, the argument that this was a lawful stop? The prosecutor made two arguments on the suppression, response to the suppression motion. One was that the DMV records were not subject to suppression as a category. The second was, as you say, that the stop was legal. The trial court judge ruled only on the first ground and did not hold a hearing to adjudicate the facts of the stop. And so that's why it comes to you in this posture. But it does seem rather strange. That would have been like a 10-minute hearing. Why did you stop him while he was playing the music too loud? The defendant testifies, I wasn't playing my music too loud. The trial judge says, well, I believe you, or I believe you, and that's the end of the matter. It does seem really that's how things are done in trial court in New York City. You jump to these big constitutional issues and. I'm not sure that anyone realized that this case would eventually come before this Court, but that is the way this particular case is. Of course, we know it's too loud. It's always too loud. There's actually a provision of the New York City Administrative Code, Your Honor, which is on point. Are these things public records? If I wanted to find out if you'd been, you know, stopped for driving without a license, can I find that out? Frankly, I think that's a difficult question, Your Honor. There are certain entities to which driving records can be disclosed pursuant to the Federal Drivers' Privacy Protection Act. And there are also certain restrictions. So I think the answer to your question would depend on who was asking. But they are certainly the administrative adjudications that are made by a judge in traffic court. And in that sense, they are every bit as valid a record as the decision of any other court. There are simply certain protections with regard to DMV records specifically. Kagan, your government records argument, is it limited to New York City records or does it also apply to FBI records, to records of other cities and states which presumably would be available on a reciprocal basis? I think it would apply to records available on a reciprocal basis, Your Honor. I'd like to touch on the other issues. Sotomayor, do you see no difference between Cruz and Bynum in the typical case where the evidence against the defendant is not developed as a result of an illegal stop? It exists independent of that stop. And one in which the stop itself creates the ground for arrest. Don't you see a difference between those two things? I guess I would say that what creates the grounds for arrest here is the fact that the individual was driving with a suspended license. And the two elements of that are the fact that the individual was driving with a suspended license. Sotomayor, there was no suspicion of that when that person was stopped. The suspicion to arrest arose not independent of the illegality, but as part of it. But so, too, with Bynum. It was the match of the prints that caused the prosecutor to realize that this individual was driving. But all of the evidence at trial really had nothing to do with the fingerprint. It had to do with the victims and everyone else walking in and saying, that's the guy who did what to me. I believe in Bynum, Your Honor, the prints were critical. And here the only element in the arrest. No, in the adjudication itself. The appellate decision, may I finish my answer, on remand in Bynum, it went back, suggests that the ability to locate those prior prints in the FBI file was essential to the conviction there. Thank you, Ms. Halligan. Mr. Shah. Mr. Chief Justice, and may it please the Court. Petitioner seeks to suppress official records that were lawfully in the State's possession before any Fourth Amendment violation occurred. That unprecedented request should be rejected for three reasons. One, the DMV records were accessed merely through use of Petitioner's name. Two, those records were produced and possessed by the State long before the allegedly illegal stop at issue. And three, deterrence does not outweigh the cost, the substantial cost of suppression under the circumstances present here. Is everything that's in the Government has access to through any database considered in the Government's possession? No, I don't think I would go that far in terms of our Government records argument. I think it would have to be information. You said, as you phrased it, I thought it was in the Government's possession. Right. Effectively in the Government's possession, I think, would be the standard. So here I think we're talking not about Google, but I think we're talking about governmental records. So for us. What's the difference? In either case, they need a some search term, and then they'll get the answers. I don't see why it makes a difference. Well, I think for the governmental records part of our argument, that rationale is an independent rationale. The key part of it is that the information was actually in the Government's possession before the Fourth Amendment violation occurred. I think it's fair to say that governmental records that are produced and owned and possessed by the Government qualify. I think it's a harder argument to make that something. I'm sorry. Go ahead. That something might be that something that could be found by using Google was already in the Government's possession before the violation occurred. Well, what if it's in the Government of Colorado's possession, and they have an arrangement with New York that they'll let them check their files to find out, you know, whatever it is, Nationwide or something. Does that, your argument, apply to that? I think it could. I think it would depend on the arrangement. If it's a fully reciprocal arrangement that effectively allows the State full access to those records, then I think it may be tantamount to the State having effective possession. And how about private databases that are going to be available to the Government upon request? I think that's stretching it a little bit further. It's a little bit harder. Again, if it were the case that the State could be said to effectively have possession of those records because, for example, a copy of them are sitting on their servers or they have such full access that even though they're prepared by a private database, the State has paid for them, so they're effectively State records, that may also fall within the scope. But those are questions that are essentially pushing the boundary of what's effectually of the State. Breyer. Why? Why? The facts of this case I find confusing. Let's imagine a policeman goes with a hatchet and breaks into somebody's house illegally, and there he sees on his desk the name is Dagwood. All right? He, for other information, goes to a certain alley, starts shouting Dagwood, and people shower him with drugs. You have no doubt if that is the fruit of the poisonous tree, an out, correct? I mean, that's how they got the name. They knew the other evidence. They get to the place. Without the name, they wouldn't have gotten the drugs. Right. Okay. Out. Right? If I understand the hypothetical, they break into someone's house. Yeah. Very illegally. Right. And they find. His name. They find the defendant's name? Yes, correct. Right. The defendant's name itself is not suppressible under this question. All right. I just wondered if you're going to also say in my example, which I could make more realistic with more time, but you don't want to give me, the, the, the, but, but he uses the name, and as a result gets all kinds of evidence in the form of drugs, murder victims, whatever you want. Have you any doubt that that would be suppressible? I think the government could have an argument that, that the fruits would not be suppressible. They're not suppressible simply because you get them through a name. You break into a house, get a name. As a result of the name, you know to what criminal enterprise to go to. As a result of that criminal enterprise going to, you get every evidence under the sun, absolute direct connection, and you say that's not suppressible. A couple of responses, Your Honor. First, there is already extensive deterrent value from coppers. Okay. I just wanted to know the ultimate response. Now assume it's the opposite response. If it's the opposite response for, say, a state of argument, how is it ever different whether he's showered with drugs or showered with government records? Okay. So I think my, my, my response is that the fruits are not necessarily suppressible  And I think that's what I'm trying to get at. I know. I wanted you to assume the opposite. I got it. You win if my hypothetical there not – if it's not even drugs, it's not even government records. But if it is drugs, why isn't it government records? This won't hurt you very much, because often there will be an alternative source. But suppose there isn't. Why are government records different from drugs? Right. Because the government already possesses those records. Those records were within the government's possession before any Fourth Amendment violation occurred. It would be depriving the government of information it already had, and there is no precedent within this Court's Fourth Amendment jurisprudence that would – They break into the house with an axe, and they find out the name. They see this guy is Dagwood, and so they run that through their database, and they find this is the guy we've been looking for for the last 20 years. He is responsible for all the drugs that come into this country. He's committed numerous acts of terrorism. He's a serial killer. He's killed 50 people. We've been chasing him forever. And so the result would be all that knowledge that this is Dagwood, is the fruit of the poisonous tree, and nothing can be done about Dagwood? No, Your Honor. I want to be very clear. My response is that that is not subject to suppression. And even my friend on the other side conceded that if it were an outstanding arrest warrant, such as in your hypothetical, that were linked by finding the name, even if the name were a fruit of an illegal stop or search, that that arrest warrant would still provide a basis to arrest the defendant and prosecute the defendant. Now, it may be that other fruits that are discovered in the home or statements taken from the defendant in the home would be suppressed, but certainly the prosecution could proceed under the Kerr-Frisbee rule, and any preexisting evidence that this Government had would certainly still be invisible in the prosecution for whatever it is. Ginsburg. Would you, Mr. Shah, before you finish, you said a name is not suppressible, and that's because this Court held we started out by saying the observation of the person that got dropped out of this case, so we're talking only about records. But the extraction of a name, you say that that's not suppressible even though it was unlawfully extracted because there was no reasonable suspicion that this person did anything wrong? Shah, yes, Your Honor. We would say that a name is different, that it's not suppressible, and we'd rely on the language that this Court used in Lopez-Mendoza, which says that a Respondent's body or identity is never suppressible, even if it's obtained as a result of an illegal search, seizure, or interrogation. We think name is part and parcel of a Defendant's identity, and that it has a special status within the criminal justice system. Mr. Shah, how would you think about this problem? Suppose the police start stopping people, and rather than asking for your name, they take a blood sample, they frick your finger, and then they take that blood and they look in their very extensive DNA databases and they discover, oh, this is a guy who, you know, did these various terrible things, and start building cases. Would that be all right? Shah, Your Honor, I think other types of biometric evidence that you suggest, for example, blood evidence, might well implicate competing considerations that would dictate a different result. And let me suggest a couple of the competing considerations, why I think the Court doesn't need to reach so far and say all sorts of biometric information should be treated the same. For one thing, things like a name or even a fingerprint, this Court has said, is not a separate Fourth Amendment event to acquire that. For example, once someone is detained, it's not also a search to ask for their name or to take a fingerprint. However, in your example, pricking someone with a needle to obtain their blood would be a separate Fourth Amendment event, because that would be a separate invasion of their bodily integrity, privacy, and that might warrant different considerations, since there are two violations there. There might be a need for greater deterrence. I think the other sort of consideration that might be implicated in that type of hypothetical is that evidence unlike a name or fingerprint, DNA evidence, for example, that you suggest, might provide competing considerations in the sense that it could lead to other types of information that may not be relevant to the criminal justice system, medical records, genetic information. It may pose a specter of other competing considerations that might require a different balance in the end. I think it would be premature for this Court to weigh in one way or another as to whether that would be appropriate. I think we would need a record and we would want time to — we would want that to play out and see what the consequences were. So I don't think the Court has to go that far. I think the Court can limit it, as in this case, to name, fingerprints, and other traditionally — other information traditionally used to identify a defendant. Thank you. Roberts. Roberts. Roberts. Ms. Schwartz, you have four minutes remaining. Schwartz. Schwartz. I would first just like to address Justice Breyer's concern about what the rule should be. And so long as there is a sufficient causal relationship between the Fourth Amendment violation and the later discovery of evidence, this Court has expressed continued allegiance to this rule. So in this case, the reason why the DMV records are suppressible fruit is it fits that classic definition. Why are the observations suppressible when the identity isn't? That's another issue that was raised. The observations are, again, they fit the definition, whereas the identity does not fit that. The Kerr-Frisbee rule prevents a person himself from being suppressible, but the elicitation of his name is something entirely separate. So in other words, in the Cruz case, a majority of the Court said that a person could not suppress their person or their face from being in court. Five of the justices said that. But five justices said that the in-court identification could, under certain circumstances, be suppressible. So they drew a distinction between the person's body being brought into court, which is not suppressible because of the Kerr-Frisbee rule, and then the evidentiary use of the identity, the fact that five of the justices said that in certain circumstances it was not applicable in that case, the in-court identification could be suppressible, shows the distinction. And that's the distinction that has been confusing about this case, because the elicitation of his name is what led to the DMV records. But even if this Court found that the elicitation of the name was not sufficient or was somehow related to Kerr-Frisbee and could not be suppressible, the DMV records directly flow from the Fourth Amendment violation here, from the Prowse violation, and so it really doesn't matter. Especially in light of the decision in Wren to remove subjective motivations from the determinations of constitutional reasonableness in car stops, it's essential to enforce what remains of motorists' core Fourth Amendment rights. And the Wren standard just must be enforced, otherwise these core Fourth Amendment values will be undermined and police will be left free to stop people on the roads with no objective basis and check their I.D. and status and do fishing expeditions into this sea of data that will be linked to the police computers, and this would violate Prowse and Brown and Hibble. And I suppose would subject the police officers to liability, though, right, in civil actions? Well, again, this is a classic case where there's a clear relationship, causal relationship. So this is the sort of case where this Court has continued allegiance to application of the exclusionary rule, where the exclusionary rule is very strong. And so why would the Court say that the second sister of the exclusionary rule in this circumstance, where there's sufficiently deliberate that exclusion would be meaningful and sufficiently culpable, that the evidence would be, that application of the rule would be worth the cost? In this situation, there's no reason to abandon the exclusionary rule. Sotomayor, are you agreeing with your adversary that you abandoned and are not entitled to raise the suppressibility of the observation?  Well, I don't think so. And if you're not, in which ways is it tied to the question presented about identity, which was the issue you sought cert on? Right. I have no qualms in my adversary explaining that the question presented was limited because of the procedure of the way the trial court's decision was made. However, if this Court remanded the case, the question of whether the observations were suppressible would be very much at play. Why? Because when you entered a guilty plea, you reserved only the question concerning the Department of Motor Vehicle Records. You didn't reserve any other question. Well, but at the suppression hearing, the Court would be free to consider all of the suppressible fruit, including the statement that was made and the observations and also the DMV records. Thank you. Thank you, counsel. The case is submitted.